Richard I. Mulvey, J.
This decision involves a motion by the respondents, Ithaca Journal News, Inc., Randall Shew and Patricia Nordheimer for an order dismissing the contempt proceedings brought against them upon the order to show cause issued on the affidavit of Walter J. Wiggins, Esq., an attorney for one of the interested parties herein. The respondents’ notice states the following grounds for their motion: (1) that the order to show cause and affidavit of Walter Wiggins do not contain a plain and concise statement of any act constituting criminal contempt under article 19 of the Judiciary Law; (2) that the alleged acts do not constitute criminal contempt, and (3) the contempt proceeding herein is contrary to law.
Briefly the history of this matter is as follows: On June 19, 1968, two youths were apprehended and brought before me on a charge of petit larceny stemming from the stealing of two *357 gasoline cans from a motor boat and the subsequent apprehension of the youths by a Deputy Sheriff of Tompkins County. Present in the courtroom were attorneys Wiggins and LoPinto, representing the two youths and the respondent, Patricia Nordheimer, a reporter for the respondent, Ithaca Journal News, Inc. The following colloquy took place:
“ City Court — Ithaca, New York, June 19, 1968.
the court: O.K. There’s two charges here involving minors and there’s a possibility that they will become Youthful Offender Treatment. In that event I wouldn’t want to prejudice their rights.
mb. lo pinto: In that regard, Your Honor, I would like Your Honor to instruct the press not to print anything considering these minors.
the court: Do you have any objection?
mb. mo hugh: I certainly don’t.
the court: Maybe she doesn’t even know about the two cases.
voice: (Court Clerk) I understand she (the reporter) does.
the court: Well, I won’t even mention the two cases in court, but it’s the direction of the Court that under Section 913 of the Code of Criminal Procedure that since there is a possibility that they will be disposed of as Youthful Offenders, it will be prejudicial under that law to reveal their identity or any contents of the charge.”
Mr. Wiggins, attorney for one of the youths and Mr. LoPinto, attorney for the second youth then appeared before me in the chambers of the Ithaca City Court with their clients and requested that I give consideration to their clients being afforded youthful offender treatment. At that time both attorneys were advised while in chambers that their request would be considered and the matter was adjourned pending investigation by the Tompkins County Probation Department to determine the youths’ eligibility for such treatment.
In the afternoon edition of the Ithaca Journal the following two articles appeared:
‘ ‘ Proceedings ‘ Withheld ’
City Judge Bichard Mulvey ordered withheld from the press today court proceedings of a case he did not identify involving youths represented by attorneys Michael LoPinto and Walter Wiggins. LoPinto asked for the treatment and Wiggins and City Prosecutor Matthew McHugh concurred.
Mulvey ordered secrecy of the court records under Sec. 913e of the Code of Criminal Procedure. Mulvey said the case was one in which Youthful Offender consideration might be given, he and the others then went into his chambers.”
*358 “ Wednesday, June 19, 1968 ITHACA JOURNAL 3 Arrest Three In Theft
Three boys were arrested Tuesday by city police detectives on warrant secured by the Tompkins County Sheriff’s navigation patrol in connection with the reported theft of two full five-gallon gas tanks about 3:30 a.m. Sunday from a boat owned by Albert Kessell, 900 Dryden Rd., at Freeman’s dock on the Inlet.
According to the report of Deputy Byron YanZile, navigation officer, he went to Freeman’s to get the county’s patrol boat to answer another call and found the youths at the site. He chased their boat in the county’s craft, heard a splash and found the tanks overboard, running into one of them, YanZile reported.
Arrested were . ............., 16, of..........; ............., 16, of ............, and a third boy under age 16............. was also summoned for speeding and running without lights. The theft charges amount to petit larceny.”
(The names of the youths have been eliminated.)
At the opening of City Court on June 20, attorney Wiggins made a motion to hold the Ithaca Journal and any persons associated with the publication of the articles in contempt of court. The attorney for the newspaper was requested to come to court immediately. When he appeared he requested an adjournment in order to afford the respondents an opportunity to obtain another attorney since he is also the Acting City Judge. Mr. Wiggins subsequently submitted an affidavit supporting his oral motion to hold the respondents in contempt and an order to show cause was thereon issued returnable July 12, 1968. The respondents then brought on this motion to dismiss the contempt proceedings on the above-stated grounds.
The case was thereafter adjourned to July 17, 1968, for oral ■argument. I have reviewed the affidavit and order to show cause and find both to be clear and concise in setting forth the facts upon which this matter deals and neither the respondents’ memorandum of law nor oral argument raises any argument with respect to the sufficiency of the pleadings.
Respondents claim the following grounds for their defense:
1) The publication did not constitute an act in violation of a lawful mandate;
2) The said publication was true, full and fair report of a decision or proceeding in the Ithaca City Court;
3) The prohibition of the court, whether oral or in writing, constituted a violation of section 8 of article I of the New York Constitution.
In support of these defenses the respondents have submitted a nine-page memorandum and an additional two-page memo *359 randum. In essence the defense rests upon the legal proposition that any such order could not legally be made under section 913-f of the Code of Criminal Procedure since it would violate the constitutional protection of freedom of the press under the State and Federal Constitutions. Respondents further argue that there can be no limit or prohibition placed on a news publication unless it is libelous. They cite a number of cases in support of this proposition, e.g., Kline v. McBride & Co. (170 Misc. 974); Schlobohn v. Municipal Housing Auth. for City of Yonkers (188 Misc. 317); Seide v. Gannett Co. (44 Misc 2d 710); Sunshine Book Co. v. McCaffrey (4 A D 2d 643) and Matter of United Press Assn. v. Valente (203 Misc. 220). Point V of their brief, however, concedes there are some authorized practices of .secrecy such as set forth in the Family Court Act (§ 784); section 15 of the Domestic Relations Law with respect to sealing adoption papers, etc.
The third point of .respondents’ argument is that section 215.50 of the Penal Law grants immunity to the press unless the publication was false or grossly inaccurate and they cite People v. Post Std. Co. (13 N Y 2d 185) in support of their argument. They state the article published was a true and accurate publication.
The last point contended by the respondents is that the Youthful Offender Act does not authorize a mandate of the court prohibiting publication by the press on the treatment of juveniles.
Mr. Wiggins argued orally and submitted a brief on behalf of his client in which he argues that it matters not whether the mandate was mistakenly granted, what does matter is that it must be obeyed, until it is lawfully reversed by proper proceedings. As authority for his position he cites the case of Ketchum v. Edwards (153 N. Y. 534) and United States v. Mine Workers (330 U. S. 258).
Mr. LoPinto and City Prosecutor McHugh have concurred in the position taken by Mr. Wiggins.
Subdivision 3 of section 750 of the Judiciary Law which is made applicable to Ithaca City Court proceedings by section 210 of the Uniform City Court Act states that a court of record has the power to punish for a criminal contempt, a person guilty of a willful disobedience to' its lawful mandate.
The youthful offender provisions contained in section 913-e of the Code of Criminal Procedure were originally enacted by the Legislature of the 'State of New York in section 2 of chapter 632 of the Laws of 1944. It has been held that the Youthful *360 Offender Act is an act of human and progressive legislation intended for the benefit of a youth who makes his first mistake and that he should not be branded as a criminal therefor. (People v. Plath, 71 N. Y. S. 2d 667 [1947].) In construing a juvenile act the courts should not transcend the clear and unambiguous intent thereof, as expressed in the unmistakable language of the Legislature. The words used in a statute dealing with juvenile delinquency should be given a liberal effect and a practical construction lest their purposes be nullified. (31 Am. Jur., Juvenile Courts, etc., § 21, p. 305.)
Law libraries contain numerous books and articles on the treatment of juveniles all with the same theme that the future of a youth charged with a transgression of the law is sufficiently important to justify the court’s directing that the matter may be conducted in secrecy. For example it has been said “ The publicity which attaches to criminal conviction and punishment renders the criminal court process unsatisfactory for dealing with juvenile offenders. Such publicity renders rehabilitative ‘ machinery ’ useless. The youth who potentially would be amenable to rehabilitation is vitiated by such publicity, because a serious community stigma is attached to a conviction in criminal courts”. (Law Enforcement and the Youthful Offender by Edward Eldefonso, John Wilsey and Sons, Inc., 1967.)
The authorities I have read indicate the purpose of youthful offender treatment is not so much criminal as it is social. The attempt to protect children involved with the law is not a new .theory in New York State. In fact, one can go back to 1877 when the Legislature required the separation of children from adult criminals in police and detention facilities. Why then, when it is the established public policy of the State of New York and upon which it has spent millions of dollars in an effort to rehabilitate and provide individual guidance and protection for infant offenders, does the press feel that their involvement with the law is so newsworthy they must publish the names and acts of youthful offenders and thus scuttle this effort by the State ? Especially noteworthy is the fact that the press did not print the name of the infant under 16 who was involved.
The question therefore to be resolved is whether or not the mandate directing the respondents not to publish the names or contents of the proceedings was binding on the respondents? The pertinent part of section 913-f of the Code of Criminal Procedure reads “ The court on its own motion may, but only as to the public, order the indictment or information sealed in the case of a youth charged with crime ”. (Emphasis added.)
*361 The position of the respondents is that such a provision is not binding on them because it would constitute an unlawful restraint and abridgment upon their freedom to publish as guaranteed to them by section 8 of article I of the New York State Constitution and the First and Fourteenth Amendments to the Federal Constitution.
As Mr. Dean says in the first paragraph of his memorandum of July 19, 1968: “ As you know, the Ithaca Journal is facing the above proceeding ‘ head on ’ on the basis that there can be no Court directive, or State law for that matter, which interferes with the freedom of expression and of the press, as protected in the United States Constitution and the New York 'Constitution ”.
I do not agree with such a sweeping statement. Freedom of the press is not an unbridled right to publish any and all news regardless of its source or its effects. It appears to me that freedom of the press must be balanced against other rights such as the right of an accused to a fair trial free from unwarranted press coverage or as here the right for an infant to be spared from the life-long devastating effects of publicity for what might have been one irresponsible act caused solely by immaturity based on age alone.
As an example of the court’s concern with the unrestrained abuse of freedom of the press one needs only to read the detailed and factual opinion of Mr. Justice Clark in Sheppard v. Maxwell (384 U. S. 333) wherein he takes the presiding Judge to task for not imposing stricter controls over the press.
The fact that the Supreme Court recognizes that some controls over the press are deemed necessary is clearly spelled out when Judge Clark said (p. 359): “ The court should have made some effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides ’ ’.
As I read the Sheppard case it not only gives a Trial Judge the right but, in fact, mandates that he curb not only those giving information to the press but also that he must warn the press regarding publishing information which might be prejudicial to the rights of the accused to a fair trial. In a similar case the United States Supreme Court reversed the conviction of Billie Sol Estes and held that the only recourse other than reversal was by contempt proceedings.” (Emphasis added.) (Estes v. Texas, 381 U. S. 532, 544.)
In fact in Near v. Minnesota (283 U. S. 697, 708) one of the cases cited in the respondents’ memorandum, the Supreme Court *362 • stated ‘ ‘ Liberty of speech, and of the press, is also not an absolute right, and the State may punish its abuse.” See, also, Whitney v. California (274 U. S. 357) wherein the Supreme Court held that freedom of speech does not confer an absolute right to speak and Pennekamp v. Florida (328 U. S. 331, 347) wherein it held that courts must have power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action. .
Especially pertinent at this very time is the controversy raging between the American Bar Association and the press over the attempt by the Bar Association to draft certain guidelines (Reardon Report) for insuring a fair trial to an accused and in also protecting the press’ right to publish. In an editorial appearing in the April, 1968, issue of the American Trial Lawyers Association News Letter it was stated that the proscriptions of the Reardon Report encompass the representatives of the news media. The editorial states (p. 141): ‘ ‘ They will have to stop relying on bull sessions in the station house or the D. A’s office and do more leg work ”. The respondent Ithaca Journal itself has carried a number of articles, one as recently as July 31, concerning the strict regulations for disclosure to the press set by the Trial Judge in the pending case of James Earl Ray and also in the Sirhan Sirhan case.
To agree with the respondents’ position would mean that the effort of the Legislature to assist infants, who have committed an error in the most trying years of their lives, could be completely vitiated by the press. What possible benefit to a youth could be obtained by a court ordering the information to be sealed as to the public if the press is free to then go to a police officer, as it appears may have been done in this case, and obtain and publish the very information which the court has just ordered sealed under authority of section 913-f? What could possibly be more public than the publication and dissemination of this news in a newspaper? The respondents in Point II of their memorandum state ‘ ‘ while the purpose of such a ruling is to prevent public disclosure, so far as possible, it does not provide any mandate of any court to prohibit publication of any information relating to news or court procedure or proceeding. ” What is meant by that? This in view of the fact that the respondents recite without arguing against the validity of it that section 784 of the Family Court Act allows prohibition of news, that a court can direct that divorce proceedings and adoption proceedings be sealed.
If the courts can order Family Court proceedings, adoptions and divorce proceedings sealed and since the Supreme Court *363 has ruled that a court may limit the dissemination of news to the press by police,, defense attorneys and prosecutors as cited by the cases above, it seems to me a court can also order that news involving youthful offenders be sealed prior to its publication in order to protect the rights of an infant under the Youthful Offender Act.
The respondents raise no argument or objection with respect to the apparent validity of the Youthful Offender Act but merely argue that section 913-f does not apply to them and if it does it is unconstitutional. In my research of the law it appears that this is the first case where the press has been brought to task for. violating this section which has been in effect for over 24 years.
In oral argument the respondents stated there was no order to appeal from. I cannot agree with this contention. The fact that an oral direction was given in open court has been held to be just as binding upon those who heard it as if it were written. The direction of the court was set down by the stenographer verbatim in her minutes and no written order was required. (Silverman v. Seneca Realty Co., 154 Misc. 35; Rudnick v. Jacobson, 284 App. Div. 1064.)
It is my opinion that the acts of the respondents in this matter constitute a most serious abridgment upon the authority, not of me personally, but upon our entire judicial system. In this day of civil unrest, disobedience, and rising crime rate our court system is the last resort for maintaining a lawful society in which we all must live. When respect for the courts fails then I predict that our civilized society will be of short duration. The two respondents in this matter are mature and highly educated adults both of whom I have known personally and admired for a number of years. Why they chose this means of deliberately and willfully disobeying what I deemed to be a just and reasonable order remains to be determined. Certainly if these respondents felt that this order infringed upon their rights to publish news then they had every right and certainly the financial means to appeal from the order in a lawful and procedurally correct way. “If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the constitution now fittingly calls the ‘ judicial power of the United States ’ would be a mere mockery ”. (Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 450.)
*364 In the' case of United States v. Mine Workers (330 U. S. 258) the Supreme Court held that an order issued by a court with jurisdiction over the subject matter and persons must be obeyed by the parties until it is reversed. This is true without regard even for the constitutionality of the act under which the order was issued.
In the April 26th issue of Time magazine on page 41, there appeared quotes from speeches by two respected authorities on the law. One was by Erwin Griswold, former dean of Harvard Law 'School speaking at Tulane Law .School, who said “ One who contemplates civil disobedience should not be surprised and must not be bitter if a criminal conviction ensues. It is part of the Gandhian tradition that the sincerity of the individual’s conscience presupposes that the law will punish this assertion of personal principle.” The second speaker was Earl Morris, president of the American Bar Association who said, “ Many today seem to be demanding for themselves the unlimited right to disobey law.” But “ an essential concomitant of civil disobedience is the actor’s willingness to accept the punishment that follows * * * What is reprehensible in these acts is not the end to be achieved, but the methods of achieving it ”.
It is somewhat interesting to note that the theme for 1968 Law Day was ‘ ‘ Honor, respect and justice. Law is the floor from which the pillars rise ’ ’.
As I stated during the oral argument I did not solicit this case to be brought before me for determination and I am cognizant of the possible effects of the outcome not only upon the respondents themselves but also on myself as a Judge. I also realize that the scars incurred by the two youths involved in this unwarranted and unauthorized publication will be carried by them for the rest of their lives. But more important, there is at stake here the very future of the integrity and authority of our entire judicial process. Granted that courts- such as the City Court of Ithaca are the lowest echelon in our judicial system but also true is the fact that these are the courts where the vast majority of our citizens first appear and where the greatest number of cases are settled. If their mandates may be willfully ignored, by those of high learning and intelligence, why then should anyone else have to obey any future court orders?
I have .researched the law and studied the briefs submitted on the issue as thoroughly as I can and it is my opinion that the mandate I issued on June 19 to the Ithaca Journal and its *365 employees not to print the names of the two youths involved was a lawful mandate and that the mandate was willfully and knowingly flouted.
Even assuming the mandate might have been issued in error or by mistake there is authority for the proposition that “ orderly jurisprudence forbids that litigants should be permitted, under plea of hardship or injustice, real or pretended, to nullify or set at naught orders or decrees, however improvidently made, even if it seems certain that the court acted in granting them under misapprehension or mistake ”. (Matter of Jeacock v. Iammarino, 269 App. Div. 725.) The court held further in that case that if the defendants were unable to comply with the order, they should have moved to vacate or modify it. The leading case on contempt in New York appears to be Ketchum v. Edwards (153 N. Y. 534, supra) wherein the Court of Appeals held that it was not subject to debate that the order of a court having jurisdiction must be implicitly obeyed, however erroneous it may be.
See, also, the case of People ex rel. Davis v. Sturtevant (9 N. Y. 263) wherein it was held that a party proceeded against for disobedience to an order or judgment is never allowed to allege as a defense for his misconduct that the court erred in its judgment. To the same effect is People ex rel. Day v. Bergen (53 N. Y. 404) and Howat v. Kansas (258 U. S. 181, 190) wherein the Supreme Court held that “ even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case[,] it is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished ”.
There is little question but that the City Court had jurisdiction over the two youths and there was a possibility that they might be entitled to the benefits of anonymity under the provisions of the Youthful Offender Act prior to the respondents’ publishing the prohibited article.
I, therefore, direct that a hearing be held before me in Ithaca City Court on August 22 to determine answers to the following questions:
1) When did the Ithaca Journal and its employees first ascertain information about the two infants?
2) How did the Ithaca Journal learn of the information about the two youths?
3) Did each respondent understand the nature of my direction ?.
*366 4) What was the individual responsibility of each respondent with respect to the publication of the article?
5) What was the intent of each respondent with respect to the article’s publication?
6) Were the two items appearing on page 3 of the June 19 edition related to each other?