The OKLAHOMA PUBLISHING COMPANY, a corporation, Petitioner,

v.

The DISTRICT COURT OF OKLAHOMA COUNTY, Oklahoma, and the Honorable Charles E. Halley, acting Associate District Judge thereof, Respondents.

No. 50052.

Supreme Court of Oklahoma.

Oct. 19, 1976.

Michael Minnis, of Rainey, Wallace, Ross & Cooper, Oklahoma City, for petitioner.

Larry M. Spears, of Bay, Hamilton, Renegar, Lees & Spears, Oklahoma City, for respondents.

HODGES, Vice Chief Justice.

This is an application to assume original jurisdiction and petition for writs of prohibition and mandamus. The Petitioner, The Oklahoma Publishing Company, seeks to prevent the respondent judge from utilizing a "gag rule" in juvenile court proceedings. The juvenile is an eleven-year old child who is charged with delinquency because of the alleged commission of second degree murder. This application arose as the result of a pre-trial order entered by the judge imposing a prior restraint on publication of the juvenile's name or photograph. Because of the nature and importance of this case and the inevitability of the recurring problem, we believe it is necessary and expedient to assume original jurisdiction to discuss the constitutional questions presented, and to issue directives for collaboration and cooperation between the press, the bench and the bar for future juvenile proceedings.

On the afternoon of July 26, 1976, a railroad switchman was fatally shot in Oklahoma County as he stood on the platform of a moving switch engine. The story was published and broadcast that afternoon and the next morning by the petitioner and various other Oklahoma news organizations, with the speculation that the switchman was apparently killed by a sniper. A twelve-year old boy was taken into custody as a suspect in the killing July 27, 1976. The arrest of the suspect was reported and broadcast. The suspect was identified as "L.G." and his address was given. The next morning on July 28th, newspapers published stories that the twelve-year old suspect had been taken to Berry House Juvenile Detention Center and he was once again identified as "L.G." of the same address. On July 29, 1976, eleven-year old "L.B." appeared in an adjudication hearing on charges filed by the Oklahoma County Juvenile Bureau alleging delinquency as the result of the purported commission of second degree murder. Radio stations broadcast the name of the juvenile, television stations ran film footage of him and identified him by name, and newspapers within the county printed his name, photograph, and identified his parents.

A closed arraignment hearing was held August 3, 1976, and upon the motion of the attorney for the juvenile, the judge issued a pre-trial order to all members of the news media enjoining the dissemination of the name or picture of the juvenile [1] in order to "guarantee the confidentiality of the proceedings as required by law, to protect the rights and welfare of the juvenile, and to assure a fair, orderly and impartial trial." Further stories on the case were published and broadcast on August 4, and the juvenile was again specifically identified. News organizations continued to comment on the hearing and pre-trial order. The last news story by petitioner, identifying the juvenile, appeared in The Daily Oklahoman August 5, 1976.

---

1. The order as it pertains to the petitioner, The Oklahoma Publishing Company, provides: "IT IS FINALLY ORDERED, ADJUDGED AND DECREED by the Court that all members of the news media be, and they hereby are, restricted, enjoined and restrained from publishing, broadcasting, or disseminating, in any manner the name or picture of said minor in connection with this pending case."

█ The petitioner asserts that the trial court had no jurisdiction to enter a restraint on publication because it had never obtained in personam jurisdiction over petitioner by proper service of process. We do not find this argument persuasive. The petitioner filed a motion to vacate the order of the trial court in which it challenged the jurisdiction of the court and also asked the court to determine non-jurisdictional issues requiring the court to rule on the validity of the order. Under Oklahoma law, the voluntary appearance of a party[2] is equivalent to service, and when a party against whom a judgment is rendered files a motion to vacate the judgment upon non-jurisdictional as well as jurisdictional grounds, he will be held to have entered his general appearance for all purposes.[3]

█ Next we are presented with two ultimate issues. The first is whether the trial court, in the absence of any evidence to support its finding, may impose a prior restraint on the news media in order to assure an impartial trial? This question was answered in the negative in the recent decision of the United States Supreme Court in the case of *Nebraska Press Association v. Stuart*, —— U.S. ——, 96 SCt. 2791, 2801, 49 L.Ed.2d 683 (1976). The Court held an order restraining the news media in a public criminal trial of an adult was a violation of the constitutional guarantee of freedom of the press, and that prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights. The Court said:

"The First Amendment provides that 'Congress shall make no law . . . abridging the freedom . . . of the press,' and it is 'no longer open to doubt that the liberty of the press and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action.' *Near v. Minnesota*, 283 U.S. 697, 707, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931).

See also *Grosjean v. American Press Co.*, 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660 (1936). The Court has interpreted these guarantees to afford special protection against orders that prohibit the publication or broadcast of particular information and commentary—orders that impose a 'previous' or 'prior' restraint on speech."

The Court determined the press had the right to gather information, and required the trial judge to employ other precautionary measures, other than a prior restraint on publication, to insure a fair and impartial trial.[4] Although the Court in *Nebraska Press Association*, acknowledged in some instances a prior restraint might be permissible, it held the presumption against the use of a "gag rule" is a difficult obsta-

---

2. 12 O.S.1971 § 162.

3. *Daniel v. Daniel*, 348 P.2d 185, 186 (Okl. 1959).

4. The measures suggested by the Court in *Nebraska Press Association*, —— U.S. ——, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976) include the alternatives discussed with approval in *Sheppard v. Maxwell*, 384 U.S. 333, 357, 361–62, 86 S.Ct. 1507, 1519–1522, 16 L. Ed.2d 600, 619–20 (1966): change of trial venue to a place less exposed to the intense publicity; postponement of the trial to allow public attention to subside; use of searching questioning of prospective jurors by the trial judge to screen out those with fixed opinons as to guilt or innocence; the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court; and sequestration of jurors. These judicial controls also include the power of the trial court to proscribe extrajudicial statements by the lawyers, parties, witnesses, court officials or employees which divulge prejudicial matters; statements made by the accused to officials; the identity of witnesses or their probable testimony; any belief in guilt or innocence, or like statements concerning the merits of the case; and warnings to the media by the court as to the impropriety of publishing material not introduced into evidence and also the propriety of the remarks of the trial judge.

cle to surmount, 96 S.Ct. at p. 2808 the Court said:

"Our analysis ends as it began, with a confrontation between prior restraint imposed to protect one vital constitutional guarantee and the explicit command of another that the freedom to speak and publish shall not be abridged. We reaffirm that the guarantees of freedom of expression are not an absolute prohibition under all circumstances, but the barriers to prior restraint remain high and the presumption against its use continues intact. We hold that, with respect to the order entered in this case prohibiting reporting or commentary on judicial proceedings held in public, the barriers have not been overcome; to the extent that this order restrained publication of such material, it is clearly invalid. To the extent that it prohibited publication based on information gained from other sources, we conclude that the heavy burden imposed as a condition to securing a prior restraint was not met."

Pre-trial publicity, even pervasive, adverse publicity, does not inevitably lead to an unfair trial.[5] The portion of the pre-trial order as it related to insuring a fair trial is in error and unenforceable because no findings were made that a fair trial was otherwise unobtainable, nor were other alternatives to prior restraint contemplated. The barriers against the use of prior restraint of the freedom of the press were not overcome.

The second issue is more complex. A juvenile, not an adult, is involved, and the proceedings, rather than occurring in public in open court, are directed by statute to be held in private. The questions presented are whether Oklahoma law requires juvenile proceedings to be kept confidential, and if the trial court may consider the effect of pre-trial publicity on the juvenile and his rehabilitation? The pertinent Oklahoma statute, 10 O.S.1971 § 1111 provides that juvenile proceedings are to be held privately unless the judge specifically orders the hearing to be held in public,[6] and 10 O.S.1971 § 1125 provides that juvenile records are not open to inspection by the public unless ordered by the court.[7]

The juvenile code is geared to the philosophy of protecting a child's right to full physical, mental and moral development. The concept of the juvenile courts is that of *parens patriae*, the power of the state through the court to act in the behalf of the child as a wise parent would.[8] The ideology is that each child is a distinct individual entitled to help and treatment, not retribution from the community. The concept must, however, be balanced with the

---

5. *Nebraska Press Association v. Stuart*, 96 S.Ct. p. 2800, *supra*.

6. 10 O.S.1971 § 1111 provides:
All cases of children shall be heard separately from the trial of cases against adults. The hearings shall be conducted in an informal manner, according to the rules of evidence, and may be adjourned from time to time. The hearings shall be private unless specifically ordered by the judge to be conducted in public, but persons having a direct interest in the case shall be admitted. Stenographic notes or other transcript of the hearings shall be admitted. Stenographic notes or other transcripts of the hearings shall be kept as in other cases, but they shall not be open to public inspection except by order of the court. A decision determining a child to come within the purview of this Act must be based on sworn testimony and the child must have the opportunity for cross-examination.

7. 10 O.S.1971 § 1125 provides:
This court shall make and keep records of all cases brought before it. Such records shall be open to public inspection only by order of the court to persons having a legitimate interest therein, except that all records of proceedings in adoption cases and all papers and books relating thereto shall remain confidential as provided by law. The court shall devise and cause to be printed such forms for social and legal records and such other papers as may be required.

8. 10 O.S.1971 § 1129 provides:
This Act shall be liberally construed, to the end that its purpose may be carried out, to wit: That the care and custody and discipline of the child shall approximate, as nearly as may be, that which should be given by its parents, and that, as far as practicable, any delinquent child shall not be treated as a criminal.

court's responsibility to protect the public from delinquent acts of children.[9] The specialists in this field, many of whose treatises were referred to by the United States Supreme Court in *In re Gault*, 387 U.S. 1, 25, 87 S.Ct. 1428, 18 L.Ed.2d 527, 544 (1967) are virtually unanimously in favor of protecting from publicity the child brought under the jurisdiction of the juvenile court.[10]

The trial judge in the case before us acted responsibly, out of a legitimate concern to protect the juvenile's right not only to a fair, orderly, and impartial trial, but to prevent the adverse effect pre-trial publicity might have upon the juvenile. What we must decide is not simply whether the trial court erred in seeing the possibility of real danger to the juvenile's right to a fair trial in the absence of any findings to that effect, but whether under the circumstances of this case, the interpretation of 10 O.S. 1971 §§ 1111, 1125 and the means employed to insure the juvenile's right to anonymity were foreclosed by the First Amendment to the Constitution of the United States which provides "Congress shall make no law . . . abridging the freedom of speech, or of the press," and the Okla. Const. art. 2 § 22 which provides "Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press . . ."

The issue, then, is does the Oklahoma statute, 10 O.S.1971 § 1111 which provides hearings shall be in private unless specifically ordered by the judge to be conducted in public, and 10 O.S.1971 § 1125 providing

for confidentiality of records, prevail over the constitutional right of freedom of the press as legislative enactments in harmony with the spirit of the Constitution which do not curtail the rights reserved by the Constitution to the people.[11]

*In re Gault*, 387 U.S. 1, 25, 87 S.Ct. 1428, 18 L.Ed.2d 527, 545 (1967) extended the constitutional safeguards of due process which had routinely been granted to adults to juvenile proceedings. The court stated that "under our Constitution, the condition of being a boy does not justify a kangaroo court." The question is whether the condition of being a boy warrants extension of rights in excess of those granted by the Constitution to all citizens. Although the precise question was not before the Court in *Gault*, it indicated no disapproval of the provisions of the Arizona Juvenile Code which shielded the child from publicity, and gave tacit approval to the juvenile's right to anonymity. The Court said:

> "In any event, there is no reason why, consistently with due process, a State cannot continue if it deems it appropriate, to provide and to improve provision for the confidentiality of records of police contacts and court action relating to juveniles . . ."

Freedom of the press is not an unbridled right to publish any and all news regardless of its source or its effects. The rights of the press under the First Amendment and the Oklahoma Constitution must be balanced against the right of a juvenile to be spared from life long devastating effects of publicity for what might have been one irresponsible act caused by imma-

---

9. Reed, "Treating the Juvenile and Youthful Offender," Law Enforcement and the Juvenile Offender, pp. 57–60 (Charles C. Thomas 1963).

10. See Note, "Rights and Rehabilitation in the Juvenile Courts," 67 Col.L.Rev. 281, 285–86 (1967); Geis, "Publication of the Names of Juvenile Felons," 23 Mont.L.Rev. 141, 156–57 (1962); Handler, "The Juvenile Court and the Adversary System: Problems of Function

and Form," 1965 Wis.L.Rev. 7, 13; Note, "Juvenile Delinquents: The Police, State Courts, and Individualized Justice," 79 Harv. L.Rev. 775, 784 (1966).

11. *Thomas v. Reid*, 142 Okl. 38, 285 P. 92 (1930) provides:
 "All legislative enactments must be in harmony with the spirit of the Constitution, and no legislative act may curtail the rights reserved by the Constitution to the people."

turity based on age alone. Where the line shall be drawn in a particular case rests, not on generalities, but on the concrete clash of particular interests and the state's relative evaluation of both of them, and how one will be affected by a specific restriction, the other by its absence.[12] The First Amendment right of the news media to reasonable access to the news may in certain circumstances be balanced against and outweighed by other legitimate state interests. There is no constitutional right to the unrestricted gathering of news, and the guarantee of the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. The media is reasonably excluded from grand jury proceedings, Supreme Court conferences, the meetings of other official bodies gathered in executive sessions, and meetings of private organizations. There is no constitutional right of access to the scenes of crime or disaster where the general public is excluded, and newsmen may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal.[13]

The argument for requiring juvenile proceedings to be confidential is that: exposure of a juvenile's record of delinquency would be likely to cause impairment of rehabilitative goals of the juvenile correction procedures which might encourage the juvenile offender to commit further acts of delinquency; cause the juvenile offender to lose employment opportunities, or otherwise suffer unnecessarily; bring undue hu-

miliation upon his family because of his youthful transgressions; and that publicity may afford the hard core delinquent the kind of recognition he desires. The argument for freedom of the press to report juvenile proceedings is that the press is the watchdog of society and that if they are precluded by statute from reporting a matter of public interest, soon any judicial proceeding could be made subject to private proceedings, and a return to the star chamber would inure as the direct result of denial of the right of the press to unrestrainedly gather the news.[14]

Although the direct confrontation between the First Amendment rights of a free press and the right of a juvenile to anonymity has never been directly faced by the United States Supreme Court, in *Davis v. Alaska*, 415 U.S. 308, 319–20, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347, 355–56 (1974), the Court held that refusal to allow defendant to cross-examine a key prosecution witness who had been adjudicated a juvenile delinquent denied the defendant his Sixth Amendment right to confront witnesses, notwithstanding a state policy protecting anonymity of juvenile offenders. The Court said:

> "We do not and need not challenge the State's interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender. Cf. *In re Gault*, 387 U.S. 1, 25, 87 S.Ct. 1428, 1442, 18 L.Ed.2d 527 (1967).
>
> \* \* \* \* \* \*
>
> "The State's policy interest in protecting the confidentiality of a juvenile offend-

---

12. See *Cantrell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352 (1940).

13. *Branzburg v. Hayes*, 408 U.S. 665, 684–85, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626, 641 (1972).

14. Justice White concurring in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 259, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974) said:
 "We have learned, and continue to learn, from what we view as the unhappy experi-

ences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers. Regardless of how beneficent-sounding the purposes of controlling the press might be, we . . . remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press."

er's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness . . . ."

In *Davis*, the United States Supreme Court again impliedly acknowledged the right of the State of Oklahoma to seek to preserve the anonymity of a juvenile offender while recognizing the goal of protecting a juvenile offender from the stigma of misconduct of his youth may not be achieved in every case.

It is argued by petitioner that this case is similar to *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S.Ct. 1029, 1047, 43 L.Ed.2d 328 (1975) which held a state may not impose sanctions on the accurate publication of the name of a rape victim obtained from public records, and that there is nothing that proscribes the press from reporting events that transpire in the courtroom.[15] Petitioner argues that the adjudication hearing was held in open court and therefore what transpired at the hearing and the name and photograph of the juvenile may be published under the *Cox* rationale. The statute, 10 O.S.1971 § 1111 provides juvenile proceedings shall be held in private unless *specifically* ordered to be held in public. There is no indication that the judge distinctly and expressly ordered the hearing to be public; therefore, the rationale of *Cox* is inapplicable.

Our research has revealed two cases in which the problem of the First Amendment right of the press has been directly confronted with the juvenile's right to anonymity. The case of *Government of Virgin Islands v. Brodhurst*, 285 F.Supp. 831 (D.St.Croix 1968) involved an appeal by the editor and publisher of a newspaper from the judgment of the municipal court in which he was fined for violation of a statute which prohibited, without court authorization, publication of the names of

children who were under the jurisdiction of the court. On appeal, it was determined that a limitation may be placed on the exercise of the freedom of the press when it conflicts with maintenance of absolute fairness in the judicial process, and that the statute prohibiting publication in a newspaper of the name of the juvenile offender without permission of the court does not abridge the freedom of the press. The court concluded the balance of advantages accruing to the juvenile far outweighed the advantages to be gained by permitting the unrestricted publication of names. *Gault* was cited for the policy of juvenile law which is to "hide youthful errors from the full gaze of the public and bury them in the graveyard of the forgotten past."

In the second case, *Ithaca Journal News, Inc. v. City Court of Ithaca*, 58 Misc.2d 73, 294 N.Y.S.2d 558 (1968) the city court in *In Re Ithaca Journal News, Inc.*, 57 Misc. 2d 356, 292 N.Y.S.2d 920 (1968) had held freedom of the press was not an unrestricted right to publish any and all news regardless of its source or its effects, and that the freedom of the press must be balanced against the rights of a juvenile. The New York Supreme Court issued a writ of prohibition to the city court from continuing in the contempt proceeding. The case was resolved by the Court holding that the press could not be restrained from publishing the identity of youths charged with a crime when their identity had been obtained prior to the sealing of the formal written information.

 Although the Oklahoma statutes are not as explicit as the Virgin Islands, in construing a juvenile code the statute should be given a liberal effect and a practical construction to avoid nullification of its purpose.[16] We believe the statute is sufficiently broad to permit the court to

---

15. In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Court said:

"The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are

without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government."

16. See Note 8, supra.

enjoin the publication of the name and photograph of the juvenile offender.

■ The importance of the press' and ultimately the community's right to publish the name of juvenile offenders must be balanced against the state's interest in protecting the privacy of hearings as well as information and records in children's cases. If the press is to be afforded the freedom to gather news in this area, it will have to be shown that a child offender's right to anonymity in the present and the future is outweighed by the public's right to know. In an effort to counter-balance the First Amendment rights and the right of the juvenile to anonymity, it has been strongly recommended that newspapers should be allowed admittance to juvenile court sessions, while at the same time, being forbidden by law from disclosing the names of the participants in the hearings;[17] and that the press may be present under the provision of the statute which permits admittance of persons having a direct interest.[18]

This philosophy is compatible with that expressed in *Nebraska Press Association,* 96 S.Ct. at p. 2803, the Court said:

"The extraordinary protections afforded by the First Amendment carry with them something in the nature of a fiduciary duty to exercise the protected rights responsibly—a duty widely acknowledged but not always observed by editors and publishers. It is not asking too much to suggest that those who exercise First Amendment rights in newspapers or broadcasting enterprises direct some effort to protect the rights of an accused to a fair trial by unbiased jurors."

■ The following guidelines have been adopted in Kentucky as the result of collaboration between the press, the bench and the bar,[19] and we hereby adopt them as directives to be utilized in juvenile court proceedings in the State of Oklahoma:

(1) News media and judges should work together with confidence in, and respect for, each other; (2) news media should be welcome to attend sessions of the juvenile court, but should not disclose names or identifying data of participants unless authorized by the court; (3) names may be used if alleged juvenile offenders are remanded for criminal prosecution in an adult criminal court; (4) responsibility for developing sound public interest and understanding of the child, the community, and the court must be shared by the judge and the news media; (5) official records may be inspected only with the judge's consent unless prohibited by statute; (6) confidential reports should not be open to inspection except at the express order of the court; (7) the judge, at his discretion, may release the name or other identifying information of a juvenile offender; (8) the Canons of Professional Ethics concerning the release of information in pending judicial proceedings should be adhered to; (9) if an alleged act of delinquency is publicized, news media may be informed of the final disposition of the case; (10) news media should bear in mind that any juvenile matter may ultimately be handled as a criminal case; (11) news media should recognize its responsibility to report events in a general manner without mentioning names and addresses where some matters are of sufficient public interest and could serve as a deterrent upon others."

■ When particular conduct is regulated in the public interest, and the regula-

---

17. Geis, "Publicity and Juvenile Court Proceedings," 30 Rocky Mt. L.Rev. 101, 125–26 (1957).
New Mexico has adopted this procedure by statute. See Quinn, *"The Freedom of the Press v. The Confidentiality Provisions in the New Mexico Children's Code,"* 4 N.M.L.R. 119 (1973).

18. "Rights and Rehabilitating in the Juvenile Courts," 67 Col.L.Rev. 281, 285–86 (1967). See also 10 O.S.1971 § 1111, note 8, supra.

19. "Guidelines on the Reporting of Juvenile Court Proceedings," 35 Ky.St.B.J. 72 (1971).

tion results in an indirect, conditional, partial, abridgment of speech, the duty of this Court is to determine which of the two conflicting interests demands the greater protection under the particular circumstances presented. In essence, the problem is one of balancing the probable effects of the statute upon the right of freedom of the press against the legislative determination that a juvenile offender has the right to anonymity in order to achieve possible rehabilitation. We have carefully considered the advantages accruing to juveniles by shielding them from publicity, and those to be gained by permitted uncontrolled publication of their names and photographs, and have concluded that the restraint on the press was valid in the interest of the possible rehabilitation of the youthful offender and his subsequent integration into society.

ORIGINAL JURISDICTION GRANTED. WRITS OF PROHIBITION AND MANDAMUS DENIED.

All Justices concur.