OPINION OF THE COURT
Dominic R. Massaro, J.
By order to show cause, the Attorney-General has commenced a special proceeding to determine why, pursuant to sections 750 (A) (3) and 751 of the Judiciary Law, Anthony Consalvo should not be adjudged guilty of criminal contempt for having willfully disobeyed a court-ordered mandate. The putative contemnor is so found and adjudged.
Background
Respondent, Anthony Consalvo, is a podiatrist who was registered as a Medicaid provider in New York on December 24, 1985. Under indictment No. 8063/93, he was charged with larceny accomplished through fraudulent Medicaid billing practices during the period July 1986 through May 1992. He entered a plea of guilty to the charge of grand larceny in the fourth degree (Penal Law § 155.30 [5]) on May 10, 1994. The promised sentence upon which Dr. Consalvo negotiated the plea encompassed two components: a jail component — six months in a city institution — and a restitution component— one-half million dollars. On the date he was sentenced, November 4, 1994, the Attorney-General commenced a civil lawsuit against Dr. Consalvo to recover Medicaid overpayments. Therein was demanded the production of all patient charts from January 1986 to the date of the action. Before commencement of sentence, Dr. Consalvo moved to vacate the plea of guilty. The motion was denied, and respondent made known his intention to appeal. Respondent’s payment of the $500,000, which had been ordered by the trial court, was placed in escrow pending the appeal; and the Appellate Division granted a stay of execution of the jail portipn of his sentence.
Respondent’s contentions on appeal included challenges to the guilty plea and to the restitution. The judgment was affirmed in all respects in the Appellate Division (222 AD2d 302 [1st Dept 1995]); the Court of Appeals likewise affirmed the judgment (89 NY2d 140 [1996]). While rejecting respondent’s challenge to his guilty plea and the jail component of the sentence, however, the Court of Appeals determined that the *109 doctor was not precluded by his negotiated plea agreement from demanding a hearing on the amount of restitution properly due. Thus, a restitution hearing was ordered. Pending final resolution of the issue, the trial court maintained the status quo as to the funds surrendered — the $500,000 remained in escrow — and as to defendant’s liberty — commencement of the six-month jail sentence was stayed pending formal announcement of sentence following the final order as to restitution.
Procedural History
On March 14, 1997, in the midst of the restitution hearing, Dr. Consalvo was served with a subpoena duces tecum directing him to produce on the return date, March 21, 1997, the following: “All patient charts as required by law, for the Medicaid patients of Anthony Consalvo, D.P.M., for the period January 1, 1988 to March 31, 1993. Patient charts must be complete and original documents, not copies. See attached ‘Schedule A’ for the names and I.D. numbers for the above referenced charts.”
On March 21, 1997, respondent’s attorneys made an application to quash the subpoena. In so moving, counsel argued that it would be too costly to photocopy the patient charts. Counsel stated in her affirmation: “In addition to the foregoing, the cost to the defendant to reproduce 2,000 patient charts which he needs for his defense at said restitution hearing, is one which he cannot sustain.” (Emphasis added.) The motion was denied and Dr. Consalvo was ordered to comply with the subpoena. On the adjourned date, respondent produced 346 Medicaid patient charts, far short of the 2,176* patient charts required to be produced pursuant to the subpoena and the court’s directive.
Findings of Fact
The first witness called by petitioner was Julie Ann Roche, the sole office assistant who worked for Dr. Consalvo.
With regard to the filing of patient charts, Ms. Roche testified that she filed the charts in one of two file cabinets, each cabinet contained four drawers. All patient charts, including those receiving Medicaid, were filed throughout the two file *110 cabinets. In all of the last six years that Ms. Roche worked for Dr. Consalvo, she testified that she never discarded any patient chart; never asked his permission to discard a patient chart; never heard him ask her to discard a patient chart; and never observed the doctor discard any patient chart.
On March 25, 1997, Ms. Roche herself was served with a subpoena duces tecum directing her to bring all Dr. Consalvo’s original Medicaid patient charts for all Medicaid patients treated by him for the period January 1, 1988 to March 31, 1993. Ms. Roche searched the office’s computerized files as well as the file cabinets. In spite of diligent efforts, she was unable to locate a single patient chart.
According to Ms. Roche, when she told Dr. Consalvo that she was looking for the charts, he said in words and substance, “do what you have to do.” While she testified that respondent never stated to her that he had discarded the patient charts and/or deleted their names from the computer roster, Ms. Roche testified that besides herself, nobody else worked for respondent and nobody, except Dr. Consalvo himself, had a key to the office.
The second witness called by the petitioner was Bernice Polinsky, a senior auditor for the Attorney-General. She testified relative to an inventory she conducted of the patient charts Dr. Consalvo did turn over to the court. Ms. Polinsky testified that he turned over 346 incomplete Medicaid patient charts out of a total of 2,176.
Ms. Polinsky stated that podiatrists in the Medicaid program were required to maintain patient charts for at least six years. She calculated that six years from the time of the subpoena would extend the period back to March 14, 1991. By calculating back six years, Ms. Polinsky determined that 772 unique Medicaid patients were “treated” by Dr. Consalvo between March 14, 1991 and March 31, 1993. Ms. Polinsky also testified to the Board of Regents rule which requires that Medicaid charts be maintained for all minors until one year after their reaching the age of 21. According to Ms. Polinsky, this would have required respondent to include the charts for 259 minor children irrespective of the six-year period. He produced only 20 such charts.
Thus, at the very least, out of a total of 772 unique Medicaid patient charts and 259 minor Medicaid patient charts, hundreds, 665 it would appear, were “missing” from the inventory. This figure represents the remaining charts required to be kept for six years (426) and charts of minors that are *111 required to be kept until after the minor attains his majority (239).
Besides conducting an inventory, Ms. Polinsky testified as to telling observations concerning the 346 patient charts that were produced: numerous of them had missing patient history entries, literally “ripped out”; service dates prior to 1991 were almost totally unaccounted for. Then, too, photocopies had been inserted in place of original pages in instances where earlier, but not later “treatment” information is missing.
No witnesses were called on Dr. Consalvo’s behalf.
Conclusions of Law
Section 750 (A) (3) of the Judiciary Law authorizes a court to punish as a criminal contempt “[w]ilful disobedience to its lawful mandate.” The essential predicate for the contempt adjudication is a clear direction to one sought to be punished for disobedience in following it. In the instant case, the subpoena duces tecum combines with an unequivocal order to produce the patient charts issued personally to respondent in open court to make for sufficiency (see, Matter of Wiggins v Ithaca Journal News, 57 Misc 2d 356 [1968]).
Knowledge, not formality of service, is the determinative factor (see, People ex rel. Davis v Sturtevant, 9 NY 263 [1853]; see also, Paine, Webber, Jackson & Curtis v Pioneer Warehouse Corp., 61 AD2d 756 [1st Dept 1978]; People ex rel. Springs v Reid, 139 App Div 551 [1st Dept 1910]). And an oral order is served upon all those assembled to whom it is directed (see, People ex rel. Illingworth v Court of Oyer & Terminer, 10 App Div 25 [1st Dept 1896]).
Here, disobedience of the subpoena and the court order is in the form of affirmative conduct. Respondent, either by design or otherwise rendering himself unable to do so, opted to produce a total of only 346 patient charts; further, in more instances than not, he produced only portions thereof (e.g., deleting patient histories, omitting service date entries for earlier than 1991) while completely refusing to produce 1,830 charts.
Petitioner has established beyond a reasonable doubt (see, County of Rockland v Civil Serv. Empls. Assn., 62 NY2d 11 [1984]) that having direct knowledge of the order concerning production of all 2,176 original patient charts, respondent willfully disobeyed the court mandate. Section 750 (A) (3) of the Judiciary Law speaks in terms of a willful disobedience to a court order. In this context, “willfulness” means no more than knowing and intentional (see, e.g., Goldfine v United States, *112 268 F2d 941 [1st Cir 1959]; United States v Armstrong, 781 F2d 700 [9th Cir 1986]; United States v Nightingale, 703 F2d 17 [1st Cir 1983]).
It is well stated that in a motion to punish a party for criminal contempt where failure to produce certain books and records is extant, the petitioner is required to prove beyond a reasonable doubt that the documents were in existence when the subpoena was served and that at said time the documents were within the individual’s control (Matter of Grand Jury Subpoena Duces Tecum [Morano’s of Fifth Ave.], 144 AD2d 252 [1st Dept 1988]; Matter of Gold v Valentine, 35 AD2d 958 [2d Dept 1970]; People v Shapolsky, 8 AD2d 122 [1st Dept 1959]). To be certain, there is a professional requirement that podiatrists prepare and maintain patient charts for six years from the date of care (see, 18 NYCRR 517.3 [b] [1]), and longer when fraud is involved (see, 18 NYCRR 517.3 [b] [2]). The Medicaid Provider Manual sent to all providers details instruction with respect to the record retention requirement, and sets forth the consequence of expulsion from the system for noncompliance (see, New York State Medicaid Provider Manual, Podiatrists, §2.1.11).
Professional Presumption
Because a licensed podiatrist must conduct himself in conformity with the requirements prescribed in the governing article regulating his particular profession (see, Education Law §§ 6501, 7000 et seq.; 8 NYCRR 29.2 [a] [3]), respondent is presumed to know the rules and regulations of his profession (Matter of Taylor v Board of Regents, 208 AD2d 1056 [3d Dept 1994]). Hence, under the record retention requirements of the applicable regulations, it can be presumed that the patient charts sought herein existed at the time the subpoena was served (Matter of Kuriansky v Azam, 176 AD2d 943 [2d Dept 1991], lv denied 79 NY2d 756 [1991]; see also, People v Shapolsky, supra; United States v Johnson, 247 F2d 5, cert denied 355 US 867 [1957]).
Petitioners in contempt proceedings may employ the presumption of continuing existence and control. This presumption derives from the commonly held belief that business books and records do not self-destruct and that a substantial interest exists in maintaining them (see, Maggio v Zeitz, 333 US 56, 66 [1948] ["inference of continued possession might be warranted when applied to books of account which are not consumable or marketable, but quite inappropriate under the same circum *113 stances if applied to perishable merchandise or salable goods”]). The presumption is “ ‘nothing more than a process of reasoning from one fact to another, an argument which infers a fact otherwise doubtful from a fact which is proved’ ” (United States v Patterson, 219 F2d 659, 661 [2d Cir 1955]). As such, it is “no more than a common-sense inference, as strong or as weak as the nature of the surrounding circumstances permits” (supra). Hence, the validity and relative strength of the inference can be determined only on the facts of each particular case (United States v Johnson, 247 F2d 5 [2d Cir 1957], cert denied 355 US 867 [1957], supra; People v Shapolsky, supra).
On this record, petitioner independently established proof supportive of the presumption. Under Matter of Union Indem. Ins. Co. (89 NY2d 94 [1996]) and People v Rivera (58 AD2d 147 [1st Dept 1977], affd on opn below 45 NY2d 989 [1978]), an informal judicial admission by the defense supports a presumption that records exist where, as here, a suggestion pointing to their existence is averred by affirmation one week following service of the subpoena duces tecum. “Informal judicial admissions are recognized as ‘facts incidentally admitted * * * as * * * contained in * * * an affidavit’ * * * and [constitute] ‘evidence’ of the fact or facts admitted [citations omitted]” (Matter of Union Indem. Ins. Co., supra, at 103).
Prior Demand
Furthermore, and this is significant, there is no reason to believe that the 2,176 charts were not available when respondent requested a stay of the Attorney-General’s civil action, wherein he was served with a document production request. Included in said demand was all of his Medicaid patient files extending back in time to January 1986, that is, when he first registered as a Medicaid provider. This was a defining moment. Respondent’s obligation respecting said production, or, at the very least, preserving the charts in question for later production, was effective as of that notice. It cannot seriously be contended that at the time Dr. Consalvo did not have the ability to comply. This is reasonably certain, and critical to the issue of his present disobedience seeking punishment: a self-induced inability to comply is never a defense (see, Jurney v MacCracken, 294 US 125 [1935]; People ex rel. Day v Bergen, 53 NY 404 [1873]; Matter of First Natl. Bank v Reoux, 9 AD2d 1005 [3d Dept 1959]). Intent to disobey need only be the product of rational choice.
Arguendo, even the advice of counsel as to nonmateriality to the restitution hearing of the patient charts in question, or the *114 likelihood that Dr. Consalvo’s files would not actually be relevant thereat, is wholly irrelevant (see, People v Berson, 308 NY 918 [1955]; People v Marcus, 261 NY 268 [1933]; People v Briendel, 73 Misc 2d 734 [Sup Ct, NY County], affd 45 AD2d 691, affd 35 NY2d 928 [1974]). An order of a court having jurisdiction must be obeyed however erroneous it may be (see, Ketchum v Edwards, 153 NY 534 [1897]; People ex rel. Day v Bergen, 53 NY 404 [1873], supra).
Stay is Status Quo
The stay of the earlier civil proceeding merely placed discovery in abeyance, neither relieving respondent of his obligation to produce nor rendering production moot; indeed, a stay of any proceeding only has the effect of maintaining, nay, preserving in all respects, the status quo. This despite the fact that the civil action parallel to the underlying criminal action herein was in fact rendered moot when the Court of Appeals, in 1996, upheld Dr. Consalvo’s conviction. That decision implicitly established liability as a matter of law, the Court ordering the restitution hearing — from which the instant order to show cause arises — to find “the fruits of the offense” (see, Penal Law § 60.27 [2]), which serves to determine loss for purposes of concluding civil liability (CPL 420.10 [6]). But all this was certainly in futuro two years before, in 1994.
A prima facie case of criminal, contempt consists of proof of service or knowledge of a court’s mandate or order and willful disobedience thereof. It is not initially incumbent upon a petitioner in a contempt proceeding to prove a respondent’s lack of “good cause” for disobedience. The burden of coming forward, not proof, rests upon a respondent should he elect to prove good cause for noncompliance. The reason has been well stated: such facts are peculiarly and almost exclusively within a respondent’s firsthand knowledge, with the details not readily available to a petitioner (see, People v D'Amato, 12 AD2d 439 [1st Dept 1961]; accord, United States v Fleischman, 339 US 349 [1950]; Morrison v California, 291 US 82 [1934]). No burden befalls a petitioner to negotiate all possible excuses for noncompliance with a court order (see, Goldfine v United States, 268 F2d 941, supra). And while it is true that a respondent may assert his US Constitution Fifth Amendment privilege rather than come forward with such a reasonable explanation, the privilege is never a substitute for proof of good cause for noncompliance (see, United States v Rylander, 460 US 752 [1983]; Sigety v Abrams, 632 F2d 969 [2d Cir 1980]; Matter of Bleakley v Schlesinger, 294 NY 312 [1945]).
*115 Finally, for the purpose of fending off a contempt adjudication, partial or even substantial compliance with a court order is not obedience to it (see, Matter of Kuriansky v Azam, 176 AD2d 943 [2d Dept 1991], lv denied 79 NY2d 756 [1991], supra). Only all reasonable efforts to comply staves off contempt (see, e.g., Combs v Ryan’s Coal Co., 785 F2d 970 [11th Cir 1986]).
Conclusion
Petitioner has proven beyond a reasonable doubt that Anthony Consalvo had knowledge of the subpoena and court order, that he disobeyed both, and that this disobedience was willful. This contumacious conduct is clear and unambiguous, and intolerable in a judicial system that seeks to find truth. Respondent is thus adjudicated in criminal contempt of court.

 The subpoena contained a “Schedule A” which included the names and Medicaid identification numbers for all Dr. Consalvo’s Medicaid patients billed by him from January 1, 1988 through March 31, 1993. The list numbered 2,176 names.